Filed 6/22/15  P. v. Warner CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>JEFFREY DEAN WARNER,<br><br>          Defendant and Respondent. | A141106<br><br>(Contra Costa County<br>Super. Ct. No. 5-120379-3 ) |

After a two-week jury trial, defendant Jeffrey Dean Warner was found guilty of the following crimes against his fiancé Marianne McKinney, all occurring over 20 hours in December 2011: attempted mayhem, false imprisonment by violence, felony domestic violence, assault with a deadly weapon, criminal threats and dissuading a witness.  The jury also found true the allegations that Warner used scissors as a deadly and dangerous weapon, and maliciously tried to prevent a witness (his fiancé) from cooperating or providing information.[1]  The issue in this case is whether the trial judge properly granted defendant's motion for a new trial on the ground that a juror failed to disclose in voir dire she had previously sought two restraining orders, one in 2006 against her daughter's methamphetamine using boyfriend, who made a threatening gesture and promised "hell to pay" if the juror tried to call the police; and one in 2008 against her violent

---

[1] The jury found "not true" the special allegations that in the commission of felony domestic violence (Pen. Code, § 273.5,subd. (a)), he personally inflicted great bodily injury upon the victim (Pen. Code, § 12022.7, subd. (e)), and that he personally used a lit cigarette as a deadly and dangerous weapon (Pen. Code, § 12022, subd.(b)(1)).

methamphetamine using daughter, who threatened to slit the juror's throat. After thoroughly questioning the juror months after the verdict, the court found the juror's nondisclosures were inadvertent, but critical, material and "fatal" to this case. The trial judge issued an order for a new trial, which we now affirm.

BACKGROUND

Because the motion for new trial was based primarily on what happened in voir dire, we describe the evidence at trial only briefly. We describe the jury selection process in some detail, focusing particularly on Juror 17, whose actions were the basis for the motion for new trial and this appeal.[2]

*Trial*

Marianne McKinney, defendant Warner's then fiancé and two months pregnant, jumped out a first floor window and called 911 to report that Warner had just beaten her over a 19-hour period on December 19 and 20, 2011. She said she had lost consciousness twice because he had been beating her on the head. According to McKinney, she and Warner both ingested methamphetamine at some point during the period in question; he forced her to use it even though she had stopped using on account of her pregnancy. McKinney told law enforcement that when Warner forced her to use methamphetamine, he told her, " 'it's gonna be a long night and you're gonna be up all night.' "[3] In interviews with law enforcement officers McKinney described brutal beatings at the hands of Warner, including that he put his finger in her eye, held scissors to her neck and threatened to kill her, and dragged her around the apartment by her hair so violently that her hair was ripped out. She reported that she had been beaten "maybe 50 times since last night until this morning." McKinney told law enforcement that defendant threatened her by saying he would have to figure out a way of getting rid of her body. McKinney

---

[2] The parties refer to the juror as "17," since this was the number on her jury questionnaire, and so do we. This juror is also described in some of the court minutes as Juror 8, which refers to her seat in the jury box.

[3] At trial, McKinney said she took the methamphetamine voluntarily.

2

was taken to the hospital. She had documented injuries, including scratches to her eye, lumps on her head, contusions, and a concussion.

Warner made several phone calls to McKinney from the county jail in which he tried to dissuade her from cooperating with the police and encouraged her to recant.[4]

At trial, McKinney disavowed her earlier statements, in essence taking the position that she had made the reports to law enforcement because she was "mad" at defendant for "being a two-timer[,]" and that she lied to get Warner in trouble. She attributed her injuries to jumping out the window in pursuit of Warner. She denied that he had hit her.

*Jury Selection*

The trial judge started the jury selection process by summarizing each of the criminal charges against Warner, and all of the special allegations. She told the jurors that Warner was charged with the felony of "inflicting corporal injury to a spouse or cohabitant . . . with the additional allegation that he personally inflicted great bodily

---

[4] In his opening statement, defendant's attorney gave the jurors a preview of the phone calls: "[y]ou're going to hear an angry, frustrated, pissed off, vile, foul-mouthed Jeffrey Warner on the phone. Because he's sitting in jail now because of what lies Marianne McKinney told the police." In the course of one phone call, McKinney, in real time, told defendant that the police were approaching to talk to her, and Warner then instructed her repeatedly, vehemently and at length to avoid them. "You ain't got to talk to the cops. You ain't got to talk to them cops. Tell 'em you got nothing to say to 'em . . . . Go in the backyard, jump over the fence. Say you got nothing to say to 'em except, you know, or just go in the backyard and just take off. . . . You're gonna go fucking, uh, kick back, hide somewhere. Doesn't matter." In another phone call, in response to McKinney worrying about whether she would get in trouble for not coming to court, Warner told her, "I know plenty of people that haven't come to court with me. How do you think I've beat cases? I've beat the fucking, and then nobody ever went to jail for not coming to court. . . . Been in many fucking cases like that." He then purported to describe cases against him that had been dismissed. In yet another call Warner told her to talk to a law enforcement officer about him and "tell him, 'Look, man, Jeff's in there wrongly, you know, and I fucked up, 'cause I'm sorry, and I fucked up. And I want to just make it right.' . . . You know, you fell out the window, whatever. You hurt your head or something. And you just made it all up because, uh, I was trying to break up with you. . . ."

3

injury upon the alleged victim. And in the course of the offense that he personally used a lit cigarette." The trial judge also read the names of the potential witnesses.

At some point in the jury selection process, the prospective jurors had been given a one-page written Jury Voir Dire Questionnaire that asked a set of general questions not tailored to any particular case that were to be answered under penalty of perjury. The instructions at the top of the form state that "instead of asking these questions of each prospective juror in the courtroom, the court asks you to complete this questionnaire." In response to questions whether "you, a family or household member [have] ever been a party to a lawsuit," or a "victim, witness or defendant in a criminal matter," Juror 17 checked the "no" boxes. Juror 17 also checked "no" in response to the general question whether there was any reason she could not be "fair and impartial in a civil or criminal case." The form questionnaire did not ask about domestic violence or drug use.

Juror 17 was among the first group of prospective seated jurors. The trial judge asked the jurors to respond orally to a set of written questions that had been given to each of them. When it was Juror 17's turn, she said she was a "mom, housewife, horse breeder, hair dresser." She had lived in Pittsburg for 31 years, and currently lived with her husband and one of her daughters, a child caregiver. Her husband was a retired "auto tech." In response to a written question which apparently asked whether she had ever had any experience with this type or kind of case before, she stated, "I've never been in—known anyone that's been personal experience with this case for trial." Juror 17 had never been on a jury, never been arrested; she knew people in law enforcement for "20-plus years," and said "yes, I can be fair and impartial."

The prosecutor then began questioning prospective jurors. Following standard practice, the prosecutor told the seated jurors that he would be asking questions specific to one juror and questions to the entire panel, and that if any jurors had a response to the group question they should raise their hands so he could call on them. But he added, "If I'm asking somebody a specific question and you think there's something I need to know based upon what I'm asking them, please just go ahead and raise your hand and I'll—I'll get to you as soon as I can."

4

Juror 17 was asked a series of questions about what proof of intent she would require in a hypothetical case involving a bank robbery. The questions were apparently designed to see whether jurors needed to hear an expression of intent from the defendant directly, or whether "everybody feel[s] comfortable with looking at all of the evidence and coming to the conclusion that based upon that evidence they intended to do something specific."

It was clear from the prosecutor's questions that this case involved domestic violence, and the prosecutor attempted to draw the jurors into a discussion on the issue. The prosecutor asked jurors about whether they believed that "family violence" belongs in criminal court. The entire panel, including Juror 17, was asked whether they believed a case should be prosecuted even against the wishes of the victim. The prosecutor asked prospective jurors' views on topics such as why someone might stay in an abusive relationship,[5] whether a victim might lie about who had injured them or attempt to hide the abuse, and whether there was a threshold level of injury before a crime of violence should be brought to court.

In response to a question whether jurors themselves, or someone they knew, worked at "any type of shelter or counseling places to help victims of abuse," Juror 17 responded that "my daughter is in a shelter right now." These questions and answers followed:

"[Prosecutor]: And is that because of a domestic violence incident?

"[Juror 17]: No, but there are women in there who have been involved in domestic violence.

"[Prosecutor]: And did she talk to you about what happened to them?

"[Juror 17]: Yes. And I have personal friends who have been involved in domestic violence, physical.

"[Prosecutor]: And have any of them stayed in those relationships?

---

[5] One prospective juror commented that a domestic violence victim "might be afraid for themselves or their family members." As will be seen, this may have pertained to Juror 17's family situation.

5

"[Juror 17]: Yes.

"[Prosecutor]: And how does that make you feel if they stay.

"[Juror 17]: One of them was a personal friend of mine. I told her that after being married myself for 44 years, love is one thing but stupidity is another. You just need to get out of the situation or you're just going to keep going through it and wasting everybody's time including yours so—

"[Prosecutor]: Thank you. [¶] Is there anything about that that you think is going to be difficult or make it difficult for you to sit on this particular jury?

"[Juror 17]: No."

Defense counsel was given the opportunity to question the prospective jurors and he, too, made clear that this was a "domestic violence case."

It is undisputed from the voir dire that prospective jurors must have known the case involved domestic violence. Various jurors commented about their relatives' experience with domestic violence, and counsel followed up on these answers in open court, even when the domestic abuse had occurred in the past. For example, defense counsel followed up about one prospective juror's experience with her sister:

"I hate to bring up probably what's an uncomfortable situation and something you would rather leave in the past, but I'm going to have to. [¶] The situation with your sister, I just need to assure myself that in no way that's going to have a bearing on your ability to give my client, who's accused of in essence a domestic violence type of situation, any—look at him differently because of the experience you bring into the courtroom with you."

None of these questions or answers about domestic violence prompted Juror 17 to raise her hand.

The court continued to reseat new prospective jurors as jurors were excused for cause or by reason of peremptory challenges, and each time the court permitted both counsel to engage in further voir dire. One of the newly seated prospective jurors volunteered that she did not know if she could be fair and impartial because she was a victim of domestic violence, and her "ex" had broken her ankle, tibia and fibula. The

6

trial judge immediately responded, "I think that's enough said right there. Counsel stipulate?" When both counsel instantly assented, the judge thanked and excused the prospective juror for cause. Immediately thereafter, a newly seated juror volunteered that he had grown up in an "abusive home" during his childhood from age 7 to 17; his father was an alcoholic. When he indicated his concern about not being able to be fair and impartial, the court responded evenly, "Well, that's a long time to live in an abusive household. And what I'm concerned about is that you may think you could be fair. But, as the testimony progresses, it might bring back a lot of memories for you." When the juror said that it already had, and that he questioned why "women stay in that environment," the court readily responded that it was "probably a safer bet that you not sit" as a juror. In the presence of all of the prospective jurors, the trial judge again sought and obtained the oral stipulations of counsel to excuse this juror for cause.

A prospective juror volunteered that someone very close to him had a "violent experience" about 10 years ago, but he could be fair. In rapid succession, another newly seated prospective juror volunteered that his mother had been a victim of domestic abuse in India, but he, too, could be fair. When it was the prosecutor's turn to question again, he followed up with these jurors to see whether their experiences would affect their ability to serve as jurors in this case, and questioned the newly seated jurors about an array of considerations in prosecuting domestic violence cases, including the credibility of the victim who stays in a domestic violence relationship. He concluded his questioning by asking prospective jurors the open-ended question whether there was "anything else that you think myself, [defense counsel], or the judge should know about you sitting on this type of jury." Once again, Juror 17 did not respond.

When it was defense counsel's opportunity to question the newly seated jurors, he too followed up with the two jurors who had disclosed domestic violence situations in their families. Both said they could be fair and that their past experiences would not color the evidence in this case.

Shortly thereafter, the jury of 12 was sworn, including Juror 17. Without further voir dire, counsel exercised their peremptory challenges as to the prospective alternate

7

jurors, and two were seated.  Seven jurors had been excused for cause, all by stipulation and all related to domestic violence.

No questions were asked during voir dire about methamphetamine or any illegal drugs.

*Motion for New Trial*

The jury returned a verdict on March 20, 2013.  On October 31, Warner made a motion for new trial on the ground that Juror 17 engaged in misconduct by "conceal[ing] her bias against those accused of domestic violence during voir dire," obtaining information about the case from outside sources, conducting an unauthorized view of the scene, and then communicating her "bias, special personal knowledge and experience to her fellow jurors."  The motion was the result of post trial interviews by Scott Whitney, a defense investigator.  Whitney obtained a declaration from Juror 35 who stated, among other things, that a person (later identified as Juror 17) disclosed during deliberations that her daughter was an addict and had an abusive boyfriend who had done similar things alleged to have been committed by defendant Warner.  Juror 35's declaration also stated that Juror 17 said one of her adult children lived at the apartment complex where Warner committed the crimes, and that she herself had walked through the complex during the trial or jury deliberations, and had views about the outcome of Warner's case based on her knowledge of the layout of the complex.

According to Whitney's declaration in support of defendant's motion for new trial, Contra Costa court records showed that Juror 17 obtained a restraining order against her daughter's abusive boyfriend in 2006, as well as a restraining order against her daughter. ~(CCT 742; 832)~  Whitney described his interview with Juror 17 at her home in July 2013.  Juror 17 "offered, unsolicited, that she was aware of the apartment complex because about five years ago her daughter . . . lived in the complex down the road.  [Juror 17] said that she told the jurors during deliberations that she was familiar with the complex in question from visiting her daughter five years ago.  [She] denied going to the complex during the time of the trial."  Juror 17 "stated that her daughter . . . had similar dealings to the parties in the case, with drugs and domestic violence.  [She] did not

8

elaborate on this further, but she made it clear that she had strong opinions about 'those people.' She stated that Warner needs to get out of society and spend his life in prison. [¶] [Juror 17] said that she believed Ms. McKinney was lying in her testimony. She stated that when she saw Ms. McKinney on the stand, she 'saw the meth.' [Juror 17] explained that she could identify the meth characteristics in McKinney as a result of her experiences with her daughter's meth addition. [Juror 17] also stated there were several parallels between McKinney and her daughter . . . . She did not elaborate further on her domestic violence background."

At a hearing on November 22, the trial court heard some argument on the motion, and determined to subpoena Juror 17 for questioning.

Juror 17 testified at an evidentiary hearing on the motion for new trial on December 30. The trial judge questioned Juror 17 extensively for about 20-25 minutes, having previously elicited proposed written questions from both counsel.

The court asked Juror 17 to describe what the term "domestic violence" meant to her. She described it as "[w]hen someone is violated unnecessarily, husband and wife, boyfriend, girlfriend, neighbors, whoever."

In response to questioning, Juror 17 admitted that in 2006, she had obtained a restraining order against her daughter's boyfriend Pablo, who threatened to "come back and slit our throats and do some damage to us." She agreed with the trial court's characterization that Pablo was an "extremely violent methamphetamine user." Juror 17 did not remember the date being 2006, but knew it was "quite awhile ago." Juror 17's daughter was also "out of control" due to methamphetamine use, and Juror 17 agreed with the trial court's description (based on the application for restraining order) that the daughter "heard voices in her head, she would throw items in your home" and damage and break things, all violence that Juror 17 attributed to methamphetamine use.

Juror 17 denied that her daughter's relationship with Pablo reminded her of defendant Warner's relationship with McKinney or that she told Investigator Whitney it did. She denied that her daughter had ever been physically abused by Pablo, but stated, "[h]e might have pushed her around a couple of times. It was just, you know, something

9

that I don't approve of, but it wasn't something that was detrimentally physical— . . . [¶] —to her being. I mean, she didn't get a black eye or anything like that but—"

The judge confronted Juror 17 with the fact that in voir dire she answered "no" to the question whether she had any experience with domestic violence. Juror 17 replied, "I don't believe there's been any domestic violence in my family. . . . [¶] That's why I said no." The court continued:

"Q: And why do you say that? In the sense of I'm focusing I think not on you personally but on your daughter. Why do you think that she was not involved in a relationship with a boyfriend that was similar to the domestic violence situation?

"A: Because she was never hurt. She never had any physical evidence on her being of someone violating her in any physical way. That's why I'm telling you there was no physical domestic violence at all. . . .

"Q: Right.

"A: He's one of those guys. There's a lot out there, not so much for—it's just he's in and out of jail. . . . He's ridiculous. She doesn't need to be tied up with someone like that. I was protecting her, as well as my husband, against the possibility of her getting into something that was a little bit more out of her control on Pablo's part. [¶] But she never—I saw her regularly. Maybe the longest I didn't see her was maybe five days. And that was after he had gone back to jail. She was involved with another one that was and is still just as detrimentally lowlife, but she's—I've never seen her have any physical evidence on her that she was being domestically violent at her being. It just wouldn't happen. I'm sure our family would have—someone in the family would have noticed something. There just was nothing there."

At first, Juror 17 repeatedly denied that she had ever obtained a restraining order against her daughter. "I never put a restraining [order] on [daughter]. I wouldn't do that . . . [¶] . . . I would never do that, put a restraining [order] on her." The court then

10

confronted Juror 17 with court records regarding restraining orders.[6]  One set of records related to an application for a temporary restraining order that Juror 17 filed in July 2008 against her daughter, which described the daughter as "extremely violent."  Juror 17 claimed not to recall anything about it.  But when she looked through the documents she eventually remembered it, and gave a very long and detailed narrative answer[7] about her

---

[6] The court took judicial notice of the court records in the two Contra County Superior Court cases without objection.  The district attorney filed evidentiary objections to some of defendant's evidence in support of the motion for new trial.  The trial court apparently never ruled on these objections.  The district attorney has not squarely raised evidentiary issues on appeal.  In any event, the trial court's order was based on the testimony of Juror 17, as to which there were no evidentiary objections.

[7] We quote at some length from Juror 17's answer, which spilled out without interruption by the court:  "What that was all about was she had been gone for a couple of night.  And when she returned home, she was sitting in her car.  And I was watching out the window.  And I saw her do a hit of meth in the car, crystal.  So I was really upset.  And my [other] daughter was really upset with her, because she came to the door wanting to come in.  And I wouldn't let her come in the house. . . . [¶] So my daughter—my other daughter . . . she called my son . . . And he came over.  And I told him—I asked him, 'What am I going to do about this?'  [¶] And he said, 'Mom, the only thing you can do'— because financially there was no way we could have her admitted into a rehab. . . . [¶] So he said, 'The only way you can help her is just call the police and go that route,' only because we knew that she had some on her.  I didn't want to do that.  It was the most horrible thing in my whole world right there to turn my daughter in.  And I felt at that time, and as long as my family was supporting me and saying that that was the best thing to go, then that was what we did.  [¶] Yes, she was violent.  She's—the meth on her was like fire and gas.  I mean, it was just ridiculous.  And so the officer came out.  He searched her.  And they ended up taking her downtown Pittsburg.  [¶] . . . [T]he officer told me later . . . that she was threatening to kill herself at that time if they took her to jail.  So they took her over to J Ward. . . . [¶] . . . They observed her for the observation time, and they released her.  [¶]  During that time I did get this restraining order, because I was told, and I already knew through my mother-in-law, who has now passed, years ago she was in J Ward not for that but for alcohol.  And they only observe you for so many hours.  And they can and they will release you if they find that you are okay.  [¶] Well, unfortunately, she was released, and she got the bus.  They gave her bus money.  She came back to Pittsburg. . . . So she was sitting up there on the pipe. . . . And my daughter saw her up there. . . . And I'm thinking, why is she out.  [¶]  In the meantime,  I called the police again.  They said if she shows up at the house, you have to call again.  So I did.  [¶] I remember going down and getting that restraining order to prevent this situation that had occurred when I called the [police department] in the first place, because we didn't

11

daughter's methamphetamine use and violent behavior, the family's despair and inability to afford a rehabilitation program, and Juror 17's decision to have her daughter arrested and obtain a restraining order and hope that her daughter might receive treatment as a result. She testified about her daughter's arrests, release, and eventual treatment in a program that Juror 17 learned about from a police officer.

The court pressed Juror 17 as to why she did not disclose these restraining orders when the prosecutor asked whether she had any experience with domestic violence or restraining orders. Juror 17 replied: " 'Oh, I said no, because, yeah, I didn't even relate that with my own daughter. I mean, I figured now that she's over it— . . . [¶] and clean and got the help and—you know, I'm from the 60's, you know . . . what I'm saying. There's lots of drugs in the '60s. And I already knew about the meth, so of course back then it was called just speed but—" She also claimed she didn't remember the restraining order with her daughter; she had completely forgotten about it.

Juror 17 did remember getting a restraining order against Pablo. Her answer was convoluted as to why she didn't disclose it during voir dire: "And Pablo was the only one that was in my mind, but then I didn't even remember. I remember doing it with Pablo, but I don't remember with [my daughter]. I mean I had completely forgotten about that." On further questioning, she described in detail the circumstances of the order against Pablo. After she obtained the temporary restraining order against Pablo, he started threatening her and her husband "even more." She remembered going to court and appearing before a judge. Once the order was entered, Pablo stayed away from Juror 17, although he was still involved with her daughter. But Juror 17 didn't mention any of

---

want to go through that again. It was like, what for? [¶] So she showed up to the house again. I called [police department] and they showed up. And the officer asked me if I felt that she needed an ambulance to get her checked out again. She was acting erratic again. And I thought, well, maybe she should be taken—you know, it's the only way he can get her back over there. So they took her in the ambulance again, and she ended up being released again a few days later." Juror 17 then went on at length and in vivid detail for another uninterrupted page of testimony about the circumstances that led to finding a rehabilitation program.

this because "I didn't think it had anything to do with this particular case as far as that was old history and it was quite a while ago." When pressed, she again denied that there were "elements maybe of domestic violence" between her daughter and Pablo at the time. Juror 17 characterized her daughter as "more mouth than anything. And so he—I don't think he's ever hurt her."

Juror 17 denied telling any other juror that her daughter had personal experience with methamphetamine or domestic violence, or that she told any juror that based on her experience, she was certain defendant was guilty.[8]

When confronted, she also denied telling Juror 35 in the jury room that her daughter was an addict and had an abusive boyfriend who had done similar things. She did not even remember talking about her daughter and her problems at that time.

Juror 17 denied ever visiting the crime scene during the jury trial, but admitted she knew where it was and that she had told the investigator that her daughter lived up the street.

Juror 17 did not think that Pablo had ever made criminal threats to her daughter. When asked to characterize their situation, she replied, "Dependent on one and/or the other. She depended on him. Him dependent on her. They were both a cancer together as far as being involved with all the wrong things that they shouldn't have been involved with, naiveness on my daughter, usingness on Pablo."

The two restraining orders were almost exactly two years apart; the first one against Pablo in 2006 and the second one (a temporary restraining order against Juror's 17's daughter) in 2008. The order against Pablo expired on July 27, 2009, and required him not to contact and to stay away from Juror 17, her husband, an adult son, and another adult daughter. Juror 17 described Pablo in the application for restraining order as "my

---

[8] The prosecution filed declarations from two other jurors in support of its opposition to motion for new trial. Both jurors denied that any juror discussed a personal experience with domestic violence related issues during jury deliberations or discussed "having a child who was in a domestic violence situation or involved in any situation which was similar to the events presented at trial." The trial judge did not address these declarations in her ruling.

13

daughter's boyfriend." The application described the acts or threats that led to the application: "[Pablo] said, 'if you try to call the cops you are going to have hell to pay. He made a gesture as if he had a gun to his head as if he would shoot me." In response to the question whether the harassment caused "substantial emotional distress," Juror 17 wrote regarding Pablo, "since this incident I have been stressed out and afraid that he will hurt me or [husband] in retaliation with us or our personal property." She checked the box "yes" indicating that Pablo's conduct described above "seriously alarm[ed], annoy[ed], or harass[ed] you." In explaining why the protective order should extend to others besides herself, she wrote, "This person told me that he will cause myself and [husband's] life to be a living hell." She wanted the restraining order to be in effect "as long as court will permit. So we are safe when person . . . is released."

The request for restraining order in July 2008 against Juror's 17's daughter states that "my daughter is extremely violent" and that she is presently in county hospital "J ward" for "extreme methamphetamine use." Where the form calls for the applicant to describe what made them afraid of the person sought to be restrained, Juror 17 wrote, "[t]hreatening to come back and slit my throat, damage our personal property." Juror 17's daughter is described as "out of control screaming & yelling" at Juror 17, her husband and family. She "gets violent verbel [sic] violent," she threatens the family, hears voices, throws items inside the home and outside on the property, and causes damage. She "won't calm down because the [methamphetamine] has overtaken her past reality. I'm afraid she's going to hurt one of us [due] to her threats of slitting m[y] throat & damaging our vehicles, windows . . . ." The application reports that the police "said to get a temporary emergency restraining order." The application for restraining order against Juror 17's daughter is on a Judicial Council form that has the words "Domestic Violence Prevention" printed on the bottom of virtually every page.

After considering the evidence, the trial court found as follows:

"I think that (Juror No. 17) did not intentionally fail to disclose these restraining orders. I think that her understanding of domestic violence is somewhat different than

14

what we would consider it.  I don't find that it's an intentional omission, but it is a critical omission.

"These two restraining orders are clearly based on domestic violence.  I don't think there's any way to argue that they aren't.  And I accept [defense counsel's] representation. . . that if he had know about these two restraining orders, then he would have excused her as a juror.  And that is based on the fact that there are some significant similarities between her daughter's situation and the defendant's situation in this case, especially with the methamphetamine use, the abusive relationship the—what we clearly heard from the phone calls how [defendant] talked to Ms. McKinney on the phone.  That's domestic violence right there.  So there are some very similar qualities between the two cases.

"So the defendant has a right to an impartial jury.  And while (Juror No. 17) did vote not true on at least two of the enhancements, I don't think we can invade the province of the jury to find out why that happened.  It may have been a compromise.  It may have been she was the lone holdout, but then she agreed to proceed given the guilty verdicts on the other counts.  We can't speculate on that.  And the Court is not going to attempt to do so.

"I don't think the Court has any other alternative but to grant the motion for a new trial based on the testimony from (Juror No. 17) and the judicial notice of the documents I have before me."

The deputy district attorney interrupted and asked the court to consider a particular case before ruling.  The court put the matter over until the next day for ruling, and allowed further argument.  The court then continued with its findings:

"We go back to whether or not the facts which (Juror No. 17) failed to disclose were material, and they clearly were.  As I said yesterday, with the language that was used in both of those restraining orders, it was so significant that it was very difficult to believe that (Juror No. 17) could not have remembered it.  She did clearly remember the one restraining order against [daughter's boyfriend].  That was the earlier restraining order which was in 2006.

15

"She did not remember the restraining order that she took out against her own daughter in 2008. However, the language in the restraining order in 2008 was also very significant. When someone threatens to slit your throat in a situation involving a family, mother and daughter or mother and anybody in the household, that is clearly relevant information and material information that should have been disclosed.

"With the set of facts we have, considering the similarities between this case and the situation in which (Juror No. 17's) daughter found herself, the fact that she did not disclose is critical, and it is fatal to this case.

"So as I said yesterday—or as I was starting to say yesterday, this is not something that the Court is taking lightly. I have reviewed all of the documents submitted by counsel. I have evaluated (Juror No. 17's) testimony yesterday. And I do find that this information is material. It is material that should have been disclosed to all parties, and, therefore, the motion must be granted."

DISCUSSION

*Standard of Review*

This is an appeal from a trial court order granting a motion for new trial on the ground of juror misconduct.[9]

"We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the conduct was prejudicial. (*People v. Danks* (2004) 32 Cal.4th 269, 303.) In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [(*Nesler*)].) . . . The inquiry is whether [the] facts constitute misconduct, a legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*).)

---

[9] Although the motion for new trial was based on multiple grounds, at the evidentiary hearing and argument on the motion, the parties focused only on Juror 17's misconduct in failing to disclose information during voir dire, which became the sole basis for the trial court's order. For that reason, we do not discuss the other asserted grounds in the motion for new trial.

16

If we find juror misconduct, our next task is to determine whether it was prejudicial. We review a trial court order granting a criminal defendant's motion for new trial on the ground of juror misconduct for abuse of discretion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1255 (*Ault*).) "[W]hen a trial court, after examining all the relevant circumstances, grants a new trial in a criminal case on grounds that proven misconduct was prejudicial, that determination is not subject to independent or de novo review on appeal, but may be affirmed unless it constituted an abuse of discretion." (*Id*. at p. 1255) This is in contrast to the situation where a criminal defendant appeals the *denial* of his motion for a new trial on the ground of juror misconduct, in which case "the appellate court must independently review, as a mixed question of law and fact, the trial court's conclusion that no prejudice arose from the misconduct." (*Ibid.*, citing *Nesler*, *supra*, 16 Cal.4th at p. 582, fn. 5.) "By contrast, affirmance of a trial court order *granting* a new trial on grounds that established juror misconduct was prejudicial simply endorses the trial court's effort to fulfill *its* responsibility to protect the right to an impartial jury. Even if the trial court has erred on the side of caution in a close case, appellate deference to the court's determination produces no final victory for either party, but simply allows the matter to be retried before a new jury. For this critical reason, the determination of *Nesler*, *supra*, 16 Cal.4th 561, that the mixed law and fact question of prejudice from juror misconduct is subject to independent review after *denial* of a criminal defendant's motion for new trial, does not necessarily apply to review of an order *granting* a new trial." (*Ault*, *supra*, 33 Cal.4th at pp. 1266-1267.)[10]

---

[10] In *Ault*, the Supreme Court explicitly stated that the existence of misconduct was "essentially *undisputed*", and the only issue on appeal was the trial court's "determination of resulting *prejudice*." (*Ault*, *supra*, 33 Cal.4th at p. 1267, fn. 9). As such, the *Ault* court wrote that "we *need not and do not* consider whether a more stringent standard of review might apply to a trial court's determination of *error* leading to its decision to grant a new trial, where the claim of error involved a mixed law and fact issue." (*Ibid.*) Subsequently, the Supreme Court in *Collins*, *supra*, 49 Cal.4th at page 242, footnote 31, referred to *Ault* footnote 9 in rejecting a defendant's claim that a deferential standard should be applied to review a trial court's grant of a new trial in the penalty phase of a capital case. The court in *Collins* noted that "[i]n *Ault*, we expressly

17

Relying on *In re Carpenter* (1995) 9 Cal.4th 634, 659, the district attorney contends that "[f]indings of prejudice post trial are a mixed question of law and fact. These matters are ultimately determined by the reviewing court." But as noted above in citing *Ault*, this is not the standard in an appeal from a trial court order granting a new trial in a criminal case. In fact, *Ault* described *In re Carpenter*, a habeas corpus matter, as "procedurally inapposite." Whereas the trial court has "broad statutory discretion" to grant a new trial, the "discretion to grant relief on habeas corpus is much narrower." (*Ault*, *supra*, 33 Cal.4th at p. 1268.)

The district attorney contends that "[e]ven where the evidence is conflicting, the findings of the trial court as to juror misconduct . . . are not binding upon an appellate court." For this proposition the district attorney cites *In re Hamilton* (1999) 20 Cal.4th 273, 296-297. But this citation to *Hamilton* addresses a very different question: the standard of review when juror misconduct is raised in a petition for habeas corpus and the Supreme Court appoints a referee. In that situation, the *referee's* "factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting." (*Id.* at pp. 296-297.)

The district attorney also contends that if the trial court found bias sufficient to warrant a new trial, "that could be done only with a stronger showing than mere abuse of discretion review." For this proposition, the district attorney argues that the "stricter demonstrable reality" test applies, citing *People v. Lomax* (2010) 49 Cal.4th 530, 589. This is plainly wrong. The "demonstrable reality" test is a standard that applies to a decision to discharge a juror for inability to perform his or her duty as a juror during trial. (See *People v. Cleveland* (2001) 25 Cal.4th 466, 484; Pen. Code, § 1089 [discharge of juror during trial and substitution of alternate juror].) The district attorney cites no

_____

confined our analysis to the prejudice component of the trial court's ruling." (*Collins*, *supra*, 49 Cal. 4th at p. 242, fn. 31.) For that reason, we review the components of the trial court's order here with two different standards, one for misconduct and one for prejudice.

18

authority that the "demonstrable reality" standard applies to appellate court review of a trial court's decision to grant a new trial on the basis of juror misconduct.

*Juror Misconduct*

"When misconduct involves the concealment of material information that may call into question the impartiality of the juror, we consider the actual bias test of *People v. Jackson* (1985) 168 Cal.App.3d 700, 705 [(*Jackson*)], adopted by this court in *People v. McPeters* (1992) 2 Cal.4th 1148. 1175 [(*McPeters*)]. 'Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 . . . that he is unable to perform his duty." ([*Jackson*, *supra*,] 168 Cal.App.3d [at p.] 706.) Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination.' [Citations.] ([*McPeters*, *supra*,] 2 Cal.4th [at p.] 1175.)" *People v. San Nicolas* (2004) 34 Cal.4th 614, 644.)

"To the degree that the trial judge concludes that juror concealment, even when not intentional, reflects a state of mind that 'would prevent a person from acting impartially' then consistent with the standard in *Jackson* and *McPeters* a new trial must be granted." (*People v. San Nicolas, supra*, 34 Cal.4th at p. 646.)

The district attorney concedes that the trial judge "is in the best position to determine whether a juror's failure to disclose on voir dire was intentional or unintentional." The district attorney further contends that "[t]he trial court's finding that the nondisclosure was inadvertent is based on substantial evidence, and should be binding on appeal."

Where the district attorney parts way with the trial court's order is the finding that there was any cognizable misconduct at all. In the District Attorney's view, Juror 17 did

19

not fail to disclose anything. No questions were asked about methamphetamine in voir dire, and the incidents Juror 17 failed to disclose did not really amount to domestic violence in the mind of Juror 17.

We disagree with this unduly restrictive reading of what happened in the jury selection process in this case. Before questioning even began, the jury questionnaire asked if prospective jurors or their families or household members had ever been involved in a lawsuit. Juror 17 answered no, but that was plainly incorrect. The restraining orders were two court proceedings, and Juror 17 actually went to court in connection with them both. More broadly, the voir dire was permeated with open-ended questions about domestic violence that were followed up by court and counsel. These questions provoked discussions about victims, abusive relationships, and protective orders. One prospective juror stated that his sister had been involved in something like this case five years earlier, and had gotten a protective order against a man who later "broke his protective order and . . . was put in jail." As we noted above, Juror 17 had not forgotten that she, too, had gotten a protective order against her daughter's boyfriend, although **this** had happened some years earlier and was no longer an issue in her life. Thus, although Juror 17 was never *directly* asked in voir dire whether she had ever sought a restraining order against her daughter or her daughter's boyfriend because they had threatened her and her family members with violence, the voir dire questions were broad enough that an ordinary juror should have understood that this was something to be disclosed.

Before Juror 17 was questioned, but while she was seated in the jury box, prospective jurors discussed being around "these types of issue[s] before" and disclosed relatives who had personal experiences "of this type." One by one these jurors were excused for cause by stipulation. Even if Juror 17 didn't understand what the trial court meant when she asked counsel if they would "stipulate," Juror 17 could plainly see that prospective jurors who disclosed a connection to domestic violence were thanked and excused by the trial court and left the court room.

20

The district attorney argues further that in any event, Juror 17's experiences with her daughter and her daughter's boyfriend did not involve any domestic violence, citing Penal Code section 13700, which defines domestic violence for purposes of a specific title of the Penal Code entitled "Law Enforcement Response to Domestic Violence." This hyper technical argument is absurd.

Family Code section 6211 defines " '[d]omestic violence' " to include "abuse perpetrated against any of the following persons: . . . [¶] (b) A cohabitant or former cohabitant, as defined in Section 6209.[11] . . . [¶] (f) Any other person related by consanguinity or affinity within the second degree." "Abuse" is defined to include attempting to cause bodily injury, sexual assault, "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another," and engaging in "any behavior that has been or could be enjoined pursuant to Section 6320." (Fam. Code, § 6203.) Family Code section 6320 is authority for a court to enjoin a party from among other thing "molesting, attacking, striking, stalking, threatening . . . harassing . . . destroying personal property, contacting . . . coming with a specific distance of, or distributing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (Fam. Code, § 6320, subd. (a).)

Juror 17's daughter was "extremely violent" and threatened to slit her mother's throat. Juror 17 completed mandatory Judicial Council forms for a temporary restraining order that included the words "Domestic Violence Prevention" in the pre-printed footer, and she provided the information requested on the form about the incident of "most recent abuse." The minute order describes the proceedings as a hearing on a TRO "re: domestic violence filed by" Juror 17. We need say no more.

---

[11] Section 6209 defines " '[c]ohabitant' " as "a person who regularly resides in the household." " 'Former cohabitant' " is defined as "a person who formerly regularly resided in the household." Based on Juror 17's testimony, this would include her daughter Casey.

Substantial evidence supports the trial court's finding that Juror 17 inadvertently failed to disclose incidents of actual or threatened domestic violence.[12]

*Prejudice and Bias*

The district attorney contends that even if the trial judge found there was misconduct, the trial judge never made a finding that Juror 17 was actually biased, and the order granting new trial must be reversed. We disagree.

Although the trial court did not use the word "prejudice" or "bias," the finding is implicit in her conclusions. (See *McPeters*, *supra*, 2 Cal.4th at p. 1175 [relying on the determination "[i]mplicit in the [trial] court's findings and remarks" in considering whether there was juror misconduct].) Further, a trial court is "presumed to have applied the law correctly in the absence of a clear indication to the contrary." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 944.) After an extensive evidentiary hearing, the trial court found that Juror 17's omission to disclose the restraining orders was a "critical" omission; it was "relevant information" and "material information that should have been disclosed." The two restraining orders are "clearly based on domestic violence" and the language in the orders themselves was "significant." It was "difficult to believe" that Juror 17 did not remember the restraining order against her daughter in light of the juror's allegation that her own daughter threatened to slit the juror's throat. Juror 17 did remember the restraining order against the daughter's boyfriend. The trial court found "significant" similarities between Juror 17's daughter's and the defendant's situation in the case, which the court identified. The court accepted that defense counsel would have

_____

[12] Although Warner has not filed a cross appeal, he asks us to hold in the alternative that the trial judge's finding that Juror 17's nondisclosure was inadvertent is erroneous and not supported by substantial evidence. Warner contends that because Juror 17 immediately disclosed so many details of the restraining order regarding her daughter, this alone suggests it was unlikely she simply forgot. We defer to the trial court's assessment of Juror 17's credibility and state of mind, since the trial court was in the best position to listen and observe in the first instance, and we find it is supported by substantial evidence. We will not second guess what may have been a close call on this issue for the trial court, who observed it was "very difficult to believe that [Juror 17] could not have remembered" the restraining order involving her daughter.

excused Juror 17 had he known of the undisclosed information. By acknowledging defendant's "right to an unbiased jury," recognizing that it would be impossible to get behind the jury's verdict and find out why Juror 17 voted as she did, and concluding that Juror 17's non-disclosures were "critical" and "fatal to this case," the trial court in effect made a finding that Juror 17 was biased.

We cannot say on the record before us that the trial court abused its discretion in reaching this conclusion. Juror 17 was herself the victim of criminal threats and intimidation by her daughter's former boyfriend, who made a gesture to his head as if he was shooting Juror 17, and told her that if she called the police there would be "hell to pay." When Juror 17 sought a restraining order against him six days later, she reported on the form that she was "stressed out" and feared that the boyfriend would hurt her or her husband "in retaliation;" the boyfriend had said he would make her and her husband's lives "a living hell." It was reasonable for the trial court to consider these facts and the similarities to Warner's criminal threats and intimidation against McKinney. (See *People v. Diaz* (1984) 152 Cal.App.3d 926, 934-936 (*Diaz*) [finding rebuttable presumption of prejudice when juror fails to disclose material prior history as a crime victim].)[13] Further,

---

[13] In *Diaz*, a trial court denied a request to discharge the jury foreperson during the trial when it came to light (by comments the juror made to the bailiff ) that she had not disclosed in voir dire that she had been attacked at knife point during a rape attempt, and the case on trial was assault with a deadly weapon involving a knife. In reversing, the *Diaz* court noted the "probability of bias is substantial when a juror has been victimized by the same type of crime. As a result of such a similar experiences, bias may be conscious and the juror may attempt to persuade the other jurors defendant is guilty regardless of the evidence. More likely, however, the prior experience may cause unconscious bias. Only individuals of strong character would not be affected in some way by their previous, identical experience. Subconsciously, the juror may tend to favor the prosecution because of emotional and psychological bonds perceived to exist with the defendant's victim. Indeed, the juror may sincerely try to be impartial, and yet be unable to do so." (*Diaz, supra*, 152 Cal.App.3d at p. 939.) *Diaz* has been rejected by some courts of appeal. (See, e.g., *Jackson, supra*, 168 Cal.App.3d at p. 705; *People v.* Kelly (1986) 185 Cal.App.3d 118, 125.) However, it has not been overturned, and was cited, although distinguished on its facts, by the Supreme Court in *People v. San Nicolas, supra*, 34 Cal.4th at page 647 ("[a]ssuming *Diaz* is correct that a rebuttable presumption of prejudice arises when jurors fail to disclose their material prior history as crime

Juror 17 had been caught up with the "cancer" of the methamphetamine impacted relationship between her daughter and her boyfriend, who were in the juror's view "involved with all the wrong things that they shouldn't have been involved with." This could have described the relationship between Warner and McKinney.

And there were similarities between the boyfriend and Warner. It is an understatement to say that Juror 17 disapproved and had a very negative view of her daughter's boyfriend. She described him as "one of those guys" like many others "out there" who were "in and out of jail," and her daughter didn't "need to be tied up with someone like that." Warner was in custody and on parole, and the jury heard about this in his recorded phone calls to McKinney.[14] Juror 17 and her husband wanted to "protect[]" their daughter "against the possibility of her getting into something that was a little bit more out of her control on [the boyfriend's] part." McKinney could have used protection against Warner's violence over a 19-hour period. This case required the jurors to evaluate the credibility of the victim and to listen to recordings of Warner's multiple lengthy phone calls, which defense counsel described to the jury as "angry . . . vile [and] foul-mouthed." It is not unreasonable that, after considering the evidence during trial and Juror 17's testimony at the evidentiary hearing that the trial judge would conclude that Juror 17's fears and concerns about her daughter ("the most horrible thing in my whole world right there"), and her antipathy toward her daughter's violent drug-using former boyfriend would spill over into this case and make Juror 17 simply unfit to be a juror.

---

victims, we conclude that the presumption was rebutted in the present case"). We need not decide whether this amounted to a rebuttable presumption of prejudice in the case before us because taking into account all of the facts in this case there was substantial evidence to support the trial court's finding that Juror 17 was unable to perform her task as an impartial juror.

[14] Warner told McKinney in a recorded phone call not to show up at his parole revocation hearing so that the case against him would be dismissed. He said he would "just go to my Morrisy [sic] and fucking and get it dismissed. For you not showing up, you know what I mean? "Morrisy" was an apparent reference to his parole revocation hearing. (See *Morrissey v. Brewer* (1972) 408 U.S. 471.)

Although the jurors weren't asked about methamphetamine and drug use in voir dire, the attorneys knew from McKinney's 911 call, the police interviews and the telephone calls from the jail what the evidence would show at trial. Had Juror 17 disclosed the restraining orders, no doubt the trial judge and/or counsel would have quickly learned the basis for the orders and the similarities between Juror 17's situation and this case. Indeed, it took very little questioning to unleash a torrent of information from Juror 17 in response to the court's questions at the evidentiary hearing. The trial judge understood the significance of the juror's non-disclosure in observing that she accepted defense counsel's representation that had he known about these restraining orders, he would have excused Juror 17. Our review of the record supports that the trial court would likely have excused the juror for cause. The trial judge took an active role in voir dire, and, as we have summarized above, probed every juror's disclosure of any connection to domestic violence and sought (and without fail obtained) stipulations from counsel to excuse all such jurors for cause.

In addition to claiming the trial judge failed to make a finding of bias, the district attorney contends there was no "substantial likelihood" that Juror 17 was biased against petitioner because she simply made an honest and unintentional mistake. The district attorney relies on language from *In re Boyette* (2013) 56 Cal.4th 866, 890 (*Boyette*), a habeas corpus proceeding where the court upheld a referee's factual findings that a juror's failure to disclose prior criminal history on voir dire was not intentional or deliberate, and concluded under the totality of the circumstances that the juror wasn't biased. In adopting the referee's findings that the juror's beliefs were sincerely held and there was no bias, the Supreme Court wrote: "[w]e have held that 'good faith when answering voir dire questions is the most significant indicator that there was no bias,' (*In re Hamilton* [(1999)] 20 Cal.4th [273,] 300) and 'an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias' (*ibid.*). Here, the referee's findings that [the juror's] failures to disclose were neither intentional nor deliberate supplies sufficient support for the ultimate conclusion that [juror] was not biased against petitioner. There being 'no *substantial*

25

*likelihood*' that [juror] was 'actually biased against' petitioner (*id*. at p. 296), petitioner is not entitled to relief on this ground." (*Boyette*, *supra*, 56 Cal.4th at p. 890.)

The facts in this case are different. Here the trial court impliedly found that there was a substantial likelihood of bias, even though the disclosures were inadvertent—an outcome that *Boyette* did not foreclose. As we have discussed, a new trial must be granted if the trial judge concludes unintentional juror concealment reflects a state of mind that would prevent a person from acting impartially. (*See People v. San Nicolas, supra*, 34 Cal.4th at p. 644.)

The district attorney also argues that because defense counsel didn't follow up on the information he learned about Juror 17 from voir dire, such as that her daughter had been in a shelter and that the juror had friends who had been involved with domestic violence, defendant has waived any peremptory challenge that he might have made as to Juror 17. This argument is without merit here, where the issue is concealment by a juror. (See *People v. Green* (1995) 31 Cal.App.4th 1001, 1017 ["the Attorney General acknowledges that the defendant cannot waive what has been concealed"].)[15]

## DISPOSITION

The trial court's order granting a new trial is affirmed.

---

[15] The district attorney concludes the waiver argument with the observation that voir dire questioning is limited to inquiry in aid of the exercise of challenges for cause, citing Code of Civil Procedure section 223. This is a non-sequitur. Section 223 deals with the scope of questions on voir dire, not whether jurors must be truthful in their responses. (See *Boyette*, *supra*, 56 Cal.4th at p. 889 [false answers on voir dire can "eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial"].)

26

_____

Miller, J.

We concur:


_____

Kline, P.J.


_____

Richman, J.